# United States Court of Appeals
## For the First Circuit

No. 99-1822

ARTURO RODRIGUEZ,

Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

ON PETITION FOR REVIEW OF A FINAL ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, <u>Chief Judge</u>,
Coffin, <u>Senior Circuit Judge</u>,
and Lynch, <u>Circuit Judge</u>.

<u>Steve J. Gutherz</u> for petitioner.
<u>M. Jocelyn Lopez Wright</u>, Attorney, Office of Immigration Litigation, Civil Division, with whom <u>David W. Ogden</u>, Acting Assistant Attorney General, Civil Division, and <u>David V. Bernal</u>, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

February 22, 2000

**COFFIN, <u>Senior Circuit Judge</u>**.  This is a petition for review of a decision by the Board of Immigration Appeals that affirmed an immigration judge's order of deportation against petitioner while granting his request for voluntary departure.  Finding that the evidence supports the Board's determination, we affirm.

The Board rested its decision on the ground that petitioner did not provide persuasive evidence to rebut the statutory presumption of marriage fraud, applicable to an alien who

> obtains any admission into the United States with an immigrant visa . . . procured on the basis of a marriage entered into less than 2 years prior to such admission . . . and which, within 2 years subsequent to any admission . . . shall be judicially annulled or terminated, unless the alien establishes . . . that such marriage was not contracted for the purpose of evading . . . the immigration laws . . . .

8 U.S.C. § 1227 (a)(1)(G)(i).  <u>See</u> <u>Baliza</u> v. <u>INS</u>, 709 F.2d 1231, 1233 (9th Cir. 1983) (petitioner must show "by a preponderance of the evidence" that the marriage was not entered into to evade the immigration laws).

In this case, petitioner's marriage to a United States citizen, Ms. Diaz, occurred on August 30, 1984, less than two years before he entered the United States on August 11, 1985, which in turn was less than two years before his marriage was terminated by a judgment of annulment of the New York Supreme Court on December 19, 1986.

What is particularly significant is the specificity of the New York decree.  It provided that Ms. Diaz "shall have judgment that the marriage of the parties is annulled on the evidence found

in the Findings of Fact and Conclusions of Law . . . ."  Among the findings, which are part of the record here, are those stating that petitioner, on or about August 25th, 1984, professed his love for Ms. Diaz, saying that he "wanted to marry [her] . . . and raise a family together"; that, relying on these promises, Ms. Diaz married petitioner; that petitioner "came to the United States in August 1985 and never resided with [her] as husband and wife"; and that in November 1985, at a friend's house, petitioner stated that he married only "to obtain his green card and now that he has it and is in the United States he can tell [her] the truth."  Petitioner acknowledged receiving a summons and waived answer.  He also waived service of further papers, except for the judgment itself.[1]

In reviewing the action of the Board, we conduct very restricted scrutiny to ascertain whether the decision is supported by substantial evidence, or, to put it in more graphic terms, whether petitioner's evidence compels a contrary conclusion. See Mendes v. INS, 197 F.3d 6, 13 (1st Cir. 1999) (petitioner has "high burden" of presenting evidence that is "`so compelling that no reasonable fact finder could fail' to find that he had a bona fide marriage") (quoting INS v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992)).  The substantive question is whether, at the time of the

---

[1] The typewritten form for acknowledgment of service used the word "divorce" in one paragraph.  This was struck out and "annulment" was written in.  At two other places, blanks were filled in by words, in smaller type, indicating that the action was for annulment.  Petitioner's belated effort to question the validity of the New York proceeding based on the type of action at issue is unavailing.  Whether petitioner understood the action to have been one for annulment or divorce, it was one for termination of the marriage.

marriage, there was an "inten[t] to establish a life together."
See Bark v. INS, 511 F.2d 1200, 1201 (9th Cir. 1975). To the
extent that evidence of post-marriage conduct bears on this issue,
it is relevant. See id. at 1202.

The factual background is not extensive. Petitioner's
relationship with Ms. Diaz began with a long distance courtship,
initiated with a telephone conversation between the two in December
1983. Ms. Diaz called from New York, where she had a condominium,
lived with two teenage sons, and had a job as a social worker.
Petitioner received the call in the residence of a mutual friend in
the Dominican Republic. The two corresponded and Ms. Diaz sent a
photograph of herself. In August 1984, she came to the Dominican
Republic, met appellant in person, and traveled with him for three
weeks, at the end of which time they were married, on August 30,
1984. This was her third marriage and his second. She was 41 and
he, 40.

After several months, Ms. Diaz, not wanting to live in the
Dominican Republic, returned to the United States. Petitioner's
testimony about this period is as follows:

Q. What happened after you got married?

A. After we got married we continued writing letters and
talking and sending each other presents. We continued
our communication as husband and wife.

Q. Why did Gladys have to go back to the United States
after you were married?
                        * * *
A. Because she did not accept to live in Santo Domingo.
Only for me to come live with her, not her to live over
there.

For the next eight months, according to petitioner, they exchanged letters and phone calls. Finally, petitioner received permission to enter the United States. On August 11, 1985, he arrived in New York, took up residence with Ms. Diaz, and found a job. After three weeks, he was laid off. Unable to find another job, he moved in December to Boston at the suggestion of a friend. There he realized that the available jobs did not pay enough for his wife to join him.

He never saw Ms. Diaz again. After four months he received a post card sent by her from Puerto Rico. He had not known that she had gone there. It was an undemonstrative statement of her favorable impressions of Puerto Rico and its people, bereft of any language of endearment or intimacy. Shortly thereafter, in July 1986, Ms. Diaz sent him papers related to termination of the marriage, which he signed and returned. As we have noted, the judgment of annulment issued on December 19, 1986. Almost four more years were to elapse before petitioner came to the attention of INS, when he tried to reenter the United States on September 6, 1990, from a trip abroad.

Petitioner accepts the heavy burden he must carry, but argues that he has met it, citing correspondence and telephonic communications, both before and after his marriage. He attributed his moving to Boston to his desire to find a job to support himself and his wife and to friction with Ms. Diaz's two sons, whom he claimed were involved with guns and drugs. He also proffered a number of affidavits from friends about the marriage. These were

accepted by the judge, who said that he would weigh them in the light of an absence of opportunity for cross examination. One affidavit was from the mutual friend who had introduced the couple, and it described their relationship from the time they first talked by telephone through the later difficulties of unemployment and arguments over the handling of Ms. Diaz's children. The others were from friends who provided similar details about his problems with the teenagers and conclusory impressions of an otherwise happy marriage.

This evidence loses considerable force when measured against the near complete absence of any documentation of the parties' relationship. There are no letters and no financial or other records. There were only two photographs of the couple, taken in the Dominican Republic. Although petitioner testified that he communicated with his wife by phone and letters after his move to Boston, there is no tangible evidence of any contact in the three months following his departure. Then petitioner received the bland postcard sent by his wife from Puerto Rico.

But petitioner's most daunting obstacle is the New York judgment of annulment. The judgment itself, terminating the marriage relationship, was enough to invoke the statutory presumption. But this was more than a simple ending of the marriage; it was specifically based upon a finding of fraudulent intent to evade the immigration laws. This was a judgment, the validity of which is not contested, entitled to full faith and credit, and immune from collateral attack. Cf. Gouveia v. INS, 980

F.2d 814, 817 (1st Cir. 1992) (criminal convictions cannot be collaterally attacked in immigration proceedings).

It created not just a presumption, but a presumption plus. We need not go so far as to say that, under preclusion principles, it is itself dispositive. We need say only that it is very powerful evidence that the original intent was to use marriage as a device to evade the immigration laws. Against this, we cannot say that petitioner's personal and largely unverified protestations of love and the scant written documentation rise to anything approaching a preponderance.

So holding, we, like the Board, do not give any weight to the affidavits petitioner objects to on the ground that he was not allowed the opportunity to cross examine the affiants.

The petition for review is denied and the Board's decision is AFFIRMED.